**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

KENNETH COVERT,

               Plaintiff,

v.                                       No. CV-12-1221 CG

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

               Defendant.

## MEMORANDUM ORDER AND OPINION

**THIS MATTER** comes before the Court on Plaintiff's *Motion to Reverse and Remand for Rehearing with Supporting Memorandum* ("Motion"), filed on July 23, 2013, (Doc. 15); Defendant's *Response to Plaintiff's Motion to Reverse or Remand* ("Response"), filed on September 20, 2013, (Doc. 16); and Plaintiff's *Reply to Defendant's Response to Motion to Reverse or Remand* ("Reply"), filed on October 1, 2013, (Doc. 17).

On January 29, 2009, Kenneth Tracy Covert filed an application for supplemental social security benefits and disability insurance, alleging disability beginning July 4, 2007. (Administrative Record ("AR") 160–66, 167–71). His applications were denied on March 9, 2009, (AR 105–06), and also upon reconsideration on June 1, 2009, (AR 108–09). Mr. Covert filed his request for a hearing on August 4, 2009, (AR 123–24); a hearing was held on November 29, 2010 before Administrative Law Judge ("ALJ") Barbara Perkins (AR 71–99). Mr. Covert and Pamela Bowman, an impartial vocational expert, testified at the hearing. (AR 71–99). The ALJ issued her opinion on September 22, 2011, finding that Mr. Covert is not disabled under 20 C.F.R. §§ 404.1520(g) and 416.920(g). (AR 25). Mr. Covert filed an application for review by the Appeals Council, which was

summarily denied, (AR 1–3), making the decision of ALJ Perkins the final decision of the Commissioner of the Social Security Administration (the "Commissioner") for purposes of this appeal.

Mr. Covert complains that ALJ Perkins committed reversible, legal error by: (1) failing to analyze several of the treating and examining physicians' opinions in accordance with controlling law, (2) making a residual functional capacity determination that is contrary to the evidence and the law, and (3) relying on the vocational expert's testimony in error of the law. (Doc. 15).

The Court has reviewed the Motion, the Response, the Reply, and relevant law. Additionally, the Court has meticulously reviewed and considered the entire administrative record. Because the Administrative Law Judge did not did not commit reversible error as alleged by Mr. Covert, and all of her challenged findings are supported by substantial evidence, the Court finds that the Motion should be **DENIED** and the case should be **DISMISSED WITH PREJUDICE**.

## I.  Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992)). If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). A

court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214. A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which generally is the ALJ's decision, not the Appeals Council's denial of review. 20 C.F.R. § 404.981; *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214; *Doyal*, 331 F.3d at 760. An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214. While a court may not re-weigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## II. Applicable Law and Sequential Evaluation Process

For purposes of disability insurance benefits (DIB) and supplemental security income (SSI), a person establishes a disability when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. §
423(d)(1)(A), 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). In light of this
definition for disability, a five-step sequential evaluation process has been established
for evaluating a disability claim. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*,
482 U.S. 137, 140 (1987). At the first four steps of the SEP, the claimant has the burden
to show that: (1) he is not engaged in "substantial gainful activity;" that (2) he has a
"severe medically determinable . . . impairment . . . or a combination of impairments" that
has lasted or is expected to last for at least one year; and (3) his impairment(s) either
meet or equal one of the "Listings"[1] of presumptively disabling impairments; or (4) he is
unable to perform his "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i–iv),
416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261. If the ALJ determines the claimant cannot
engage in past relevant work, she will proceed to step five of the evaluation process. At
step five the burden of proof shifts to the Commissioner to show the claimant is able to
perform other work in the national economy, considering his residual functional capacity,
age, education, and work experience. *Grogan*, 399 F.3d at 1257.

### III. Background

Mr. Covert initially applied for disability benefits alleging debilitating left arm, hand,
shoulder, and wrist injuries, in addition to hepatitis C and knee problems. (AR 194). Mr.
Covert testified that his injuries result from an incident in 2007 when he fell from a roof
and had two surgeries on his left wrist and an incident in 2008 when he tripped in a gas
station parking lot and injured his left shoulder which required two surgeries on his
clavicle. (AR 18) (citing 79, 80, 87). In his disability application, he also stated that his

---

[1] 20 C.F.R. pt. 404, subpt. P, app. 1.

pain is the result of an old football injury. (AR 194). He claims that those impairments

inhibit his ability to lift, squat, bend, stand, reach, kneel, use his hands, remember things,

see things, and complete tasks. (AR 207). The administrative record includes his

medical records, earnings records, work history report, disability application, hearing

testimony, examining consultative reports, and non-examining state agency evaluations,

which were used by the ALJ to evaluate Mr. Covert's disability claim.

A.   *The ALJ Decision*

At step one, ALJ Perkins determined that Mr. Covert had not engaged in

substantial gainful activity since his alleged onset date of disability. (AR 13). At step two,

the ALJ concluded that Mr. Covert is severely impaired with a combination of the

following medically-determinable conditions:

> (1) Status-post open and reduction internal fixation ("ORIF") to the distal radius and scaphoid bone (July 2007);
> (2) Status-post clavicular fracture (September 2008);
> (3) Status-post ORIF of the left distal clavicle (September 2008)
> (4) Hepatitis C;
> (5) Cirrhosis and portal hypertension;
> (6) Portal hypertensive gastropathy (diagnosed July 2009);
> (7) Hypertension;
> (8) Minimal degenerative changes in the lumbar spine;
> (9) Gallstone pancreatitis;
> (10) Post endoscopic retrograde cholangiopancreatography ("ERCP");
> (11) Mild systolic heart murmur; and
> (12) Mitral valve insufficiency.

(AR 13). The ALJ found that Mr. Covert's claims that he is a "staph carrier," suffers from

a back condition, and has depressive disorder not otherwise specified ("NOS") with

major depressive disorder features, anxiety disorder NOS with generalized anxiety

features, schizoid personality disorder with avoidant personality traits, and history of

alcohol and drug abuse, alone or in combination, to be non-severe impairments. (AR 13–

14).

At step three, the ALJ determined that none of Mr. Covert's impairments, solely or in combination, equal one of the listed impairments in 20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926. (AR 16). The ALJ proceeded to step four, and made residual functional capacity ("RFC") findings that Mr. Covert can perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with some restrictions, but is unable to perform any of his past relevant work. (AR 17, 23). At step five, ALJ Perkins adopted the testimony of the vocational expert, found that Mr. Covert is capable of performing work that exists in significant numbers in the national economy, and concluded that he is not disabled. (AR 24–25).

### A.   _Step-Two Analysis: Finding of No Severe Mental Impairments_

ALJ Perkins provided a detailed explanation why she concluded that Mr. Covert does not suffer from any severe mental impairments.

First, the ALJ discussed Mr. Covert's testimony. (AR 14). She commented that Mr. Covert testified he has had symptoms of depression since 2006 and suffers from panic attacks several times per day, but has not sought psychiatric treatment or pursued a prescribed psychiatric screening. (AR 14) (citing AR 84–87). The ALJ pointed out that on October 22, 2007, Mr. Covert denied any psychiatric problems to M. Timothy Nelson, M.D. (AR 14) (citing AR 351). While Mr. Covert reported experiencing anxiety attacks to Madhu Arora, M.D. on August 28, 2008, the ALJ noted that on November 10, 2010 John Vigil, M.D observed Mr. Covert had a normal mood and was well-oriented. (AR 14) (citing AR 328, 515). For those reasons ALJ Perkins declined to order a psychiatric or psychological examination for Mr. Covert. (AR 14).

6

Next, the ALJ discussed Dr. Vigil's medical source statement, also known as an RFC assessment, dated November 10, 2010. Dr. Vigil found that Mr. Covert is markedly limited in several of his abilities, including the ability to maintain attention and concentration for extended periods, i.e. two-hour segments. (AR 14) (citing AR 518). The ALJ gave Dr. Vigil's RFC assessment little weight because she found it to be based primarily on Mr. Covert's subjective complaints, and inconsistent with Dr. Vigil's observations and objective findings. (AR 14).

The ALJ considered the medical opinions of Clifford O. Morgan, Ph.D. The ALJ commented that Mr. Covert hired Dr. Morgan to conduct a consulting psychological examination for the purposes of evaluating his disability claim. (AR 15). On February 4, 2011, Dr. Morgan examined Mr. Covert and found that he has been disabled from his mental impairments since at least 2007, and that his mental impairments of depression, anxiety, and personality disorder make it highly unlikely he will ever work. (AR 14) (citing AR 727). She also noted that Dr. Morgan conducted several tests on Mr. Covert and that the results came back normal and only suggested mild cognitive impairment. (AR 15) (citing 726). Dr. Morgan subsequently completed an RFC assessment of Mr. Covert dated April 27, 2011, in which he assigned to Mr. Covert various moderate and marked limitations in his concentration and thinking abilities. (AR 728–31). The ALJ commented that Dr. Morgan had observed that Mr. Covert had no suicidal urges or plans to self-harm. (AR 15) (citing AR 726). The ALJ determined she would give little weight to Dr. Morgan's February 4, 2011 medical opinion and subsequent RFC assessment. (AR 14, 15).

ALJ Perkins considered the treating physician opinion of Dr. Arora. On May 18,

2011, Dr. Arora sent a letter to Mr. Covert's attorney endorsing the February 4, 2011 findings of Dr. Morgan. The letter stated, "I have reviewed the report done on Kenneth T. Covert by Clifford O. Morgan, Ph.D., dated February 4, 2011. I do concur with the findings and conclusions of Dr. Morgan regarding Mr. Covert." (AR 15) (citing 735). The ALJ found the statement to be "brief, conclusory, and unsupported by objective medical evidence." (AR 15). The ALJ also noted that there is no evidence that Dr. Arora ever treated Mr. Covert for a psychiatric disorder, aside from noting that Mr. Covert complained of anxiety attacks, and that Dr. Arora is an internist not a mental health physician. The ALJ concluded she would give Dr. Arora's endorsement of Dr. Morgan's opinion "little weight." (AR 15).

The ALJ next discussed the four broad functional areas required for evaluating mental disorders. The ALJ found that Mr. Covert has only "mild" limitations in the areas of daily living, social functioning, and concentration, and has experienced no extended periods of decompensation. (AR 15–16). In making these findings, the ALJ noted that Mr. Covert told Dr. Morgan that on an average day he makes his own meals, does household chores, and cares for pets. (AR 15) (citing 724). She also commented that Mr. Covert has stated that he regularly engages with other people socially, and that his mental-state exam results were normal and neuropsychological screening suggested only mild impairment. (AR 15–16). The ALJ concluded Mr. Covert's mental impairments to be non-severe. (AR 16).

### B.   *RFC Determination*

The ALJ found that Mr. Covert has the residual functional capacity to perform a limited range of light work. (AR 17). She assigned various exertional and nonexertional

limitations, including: (1) the ability to lift and/or carry no more than twenty pounds occasionally and no more than ten pounds frequently; (2) the ability to push and/or pull with the right upper extremity and the lower extremities in a manner consistent with the those strength limitations, and with the left upper extremity no more than occasionally regardless of weight; (3) the ability to reach in all directions with the left, non-dominant upper extremity only occasionally; and (4) the ability to understand, remember, and carry out simple instructions and tasks in work that is object-focused. (AR 17).

In making the RFC determination, ALJ Farris considered Mr. Covert's testimony that he has very little use of his left arm because of his surgeries, has lost approximately forty-five pounds because of his depression and cirrhosis, and suffers from liver disease and pancreatitis because of his past alcohol abuse. (AR 18) (citing AR 81, 87). The ALJ commented that while Mr. Covert testified he has not had a drink since 2007, he told doctors several times in the months before the hearing that he consumes alcohol regularly. (AR 18) (citing AR 427, 432, 435). She noted that he testified that the strength in his left hand is only five percent of his right hand, is able to lift ten pounds with his right arm, and walk one block and back but no further. (AR 18) (citing AR 81).

The ALJ then considered the objective medical evidence in the record. She turned to Kayvon D. Izadi M.D.'s report regarding Mr. Covert's fall from a roof on July 4, 2007, from which he sustained a left wrist injury. (AR 379–80). Mr. Covert underwent a surgery several weeks after the fall; by September 24, 2007, John M. Wiemann, M.D. reported Mr. Covert had intact motor function in all nerve distributions with some limitation in wrist flexion and extension due to stiffness, and Mr. Covert was referred to physical therapy. (AR 19) (citing 356).

The ALJ noted that on May 2, 2008, Mr. Covert sought treatment at the emergency room for wrist pain caused by another fall. (AR 19) (citing AR 408). Carl Jan Gilmore, M.D. examined Mr. Covert and reported that Mr. Covert's x-ray results showed his fractures in his left wrist had healed, but that he still had left forearm atrophy due to disuse. (AR 19) (citing AR 343–44). Despite the atrophy, Dr. Gilmore found Mr. Covert's strength, muscle bulk, and function was adequate and range of motion was reasonable. (AR 19) (citing AR 343). Dr. Gilmore also reported that Mr. Covert had normal results from a neurological examination, normal neurovascular status, and good wrist flexion and extension limited only by stiffness. (AR 19) (citing AR 343). A radiology report taken that day of his left forearm, wrist, and hand indicated there was no evidence of new or acute fractures. (AR 19) (citing AR 339).

The ALJ discussed several of Mr. Covert's follow-up appointments at UNM Health Sciences Center. On June 19, 2008, Mr. Covert admitted he had failed to attend any prescribed physical therapy appointments, and was ordered to stop wearing his gauntlet splint all of the time and to only put it on when doing heavy activities. (AR 19) (citing AR 340). One week later Katherine Abraham, M.D. referred Mr. Covert to occupational and physical therapy, noting that if he engaged in therapy he could "return to prior level of function." (AR 19) (citing AR 337). The ALJ pointed out that Mr. Covert then attended only three of his prescribed therapy appointments, before ceasing treatment on July 21, 2008. (AR 19) (citing AR 290). The occupational therapist reported that on July 21, 2008, Mr. Covert's grip strength was forty-eight pounds, he had no atrophy of his left wrist as compared to his right wrist, and he had a good range of motion. (AR 19) (citing AR 290). On September 8, 2008, Mr. Covert's examining physicians found that he had no physical

impediment to continue physical therapy, and recommended he pursue therapy to increase function in his left hand. (AR 19) (citing 322).

The ALJ noted that on September 26, 2008 Mr. Covert underwent surgery for an injury to his left clavicle. (AR 20) (citing AR 281). He was again referred to physical therapy, and he set a goal to regain full range of motion, strength, and coordination within three months' time. (AR 20) (citing AR 384). However, Mr. Covert only attended one physical therapy appointment. (AR 384).

The ALJ considered other factors in making her RFC findings. She cited evidence indicating Mr. Covert has been engaging in drug-seeking behavior in connection with his complaints of pain. (AR 22) (citing AR 269, 426, 572). She also pointed out that Mr. Covert has not been compliant with various doctors' orders, like failing to: (1) complete a physical therapy program, (2) stop wearing his gauntlet splint all of the time, and (3) begin hepatitis C treatment. (AR 20). She noted that his testimony and statements in his Function Report indicate that he regularly engages in a wide range of daily activities, from household chores, self-care, and volunteer work, and that he reported there haven't been many changes in his daily activities since his conditions began. (AR 23) (citing AR 205–07). ALJ Perkins pointed out that Mr. Covert's statements conflict with a third-party statement by a family friend that Mr. Covert rarely leaves his house or his bedroom, and gave the report "little weight." (AR 23) (citing AR 247–48). The ALJ also noted the family friend stated Mr. Covert is still able to go fishing. (AR 23) (citing AR 247–48).

The ALJ proceeded to analyze and weigh the medical source statement, or RFC assessment, that consulting, non-treating physician Dr. Vigil completed on November 10, 2010. The ALJ noted that Dr. Vigil is a non-treating source, who examined Mr. Covert

11

and his medical records one time, and concluded that Mr. Covert has been significantly disabled secondary to his pain and his co-morbid conditions of depression and chronic fatigue since 2007. (AR 21) (citing AR 515–16). The ALJ recited various objective, medical observations made by Dr. Vigil during the examination, and noted that Dr. Vigil assessed Mr. Covert to suffer from chronic low back pain, left shoulder pain, left wrist pain, and bilateral knee pain, osteoarthritis, hepatitis C, cirrhosis, depression, and chronic fatigue. (AR 21) (citing AR 515–16).

Dr. Vigil opined that Mr. Covert's conditions preclude him from performing even sendentary work on a full-time sustained basis, and that the medical records and his own observations indicate that Mr. Covert has significant and substantial pain with even minimal activity and at rest, and significant problems with most aspects of daily living. (AR 21) (citing AR 516). In his RFC assessment, Dr. Vigil assigned to Mr. Covert various exertional limitations, including the ability to only lift and/or carry less than ten pounds frequently, inability to perform handling and fingering with his left hand to an unspecified degree, and unspecified limited ability to perform reaching in all directions. (AR 21) (citing AR 517).

The ALJ gave Dr. Vigil's clinical observations "great weight," but only gave his conclusions as to Mr. Covert's limitations and disability "little weight." (AR 22). The ALJ noted that Dr. Vigil did not mention whether Mr. Covert had atrophy of the hand or wrist; that Dr. Vigil remarked Mr. Covert's extremities were normal, except for limited range of motion and weakness; and that he had normal deep tendon reflexes in the upper as well as lower extremities (AR 19) (citing 515). She noted that despite these observations, Dr. Vigil found Mr. Covert's range of motion and strength had inexplicably deteriorated when

compared to the May 2, 2008 examination by Dr. Gilmore, discussed above. (AR 19). The ALJ commented, "[t]his does not make sense, unless [Mr. Covert] was not giving full effort." (AR 19).

The ALJ also reasoned that Dr. Vigil's findings are not supported by the record as a whole, a finding of disability back to 2007 is too remote, and that Dr. Vigil's opinion is "little more than speculative." (AR 21, 22, 23). She pointed out that the totality of all of the evidence she considered shows that Mr. Covert's pain is not incapacitating, since there is no evidence in the record of nerve impairment, and there is no reason why Mr. Covert could not regain most of his left, upper-extremity function within twelve months of returning to occupational therapy. (AR 23). She found Dr. Vigil's RFC assessment to be "merely a reflection of [Mr. Covert's] subjective reports." (AR 22).

The ALJ also discussed the opinions of Dr. Arora, Mr. Covert's treating physician. The ALJ pointed out that Dr. Arora was unaware that Mr. Covert had ceased his physical therapy treatments by August of 2008. (AR 19) (citing 328). On September 8, 2008 Dr. Arora noted that Mr. Covert had extension and flexion of the left wrist. (AR 20) (citing AR 407). On September 30, 2009, Mr. Covert reported having near fainting episodes, which Dr. Arora ascribed to Mr. Covert's misuse of Benadryl as a sleep aid. (AR 20) (citing AR 642). Dr. Arora observed on October 6, 2010 that Mr. Covert had decreased range of motion of the wrist, as well as "some weakness of the left hand in his grip strength and also in flexion, extension, abduction, and adduction of the thumb and abduction and adduction of the fingers." (AR 20) (citing AR 69, 546). Dr. Arora completed his own RFC assessment on that day. (AR 69–70).

On November 18, 2010, Dr. Arora endorsed the findings of Dr. Vigil as follows: "I

13

have reviewed the report done on Kenneth Covert by John Vigil MD dated November 10, 2010. I do concur with the findings and conclusions of Dr. Vigil regarding Mr. Covert." (AR 521). Dr. Arora provided no reasons or explanation for his concurrence. The ALJ assigned Dr. Arora's statement "some weight," except for his concurrence with Dr. Vigil's disability finding. (AR 21). The ALJ explained that the record does not support it, the 2007 date is too remote, and Dr. Vigil's opinion is little more than speculative. (AR 21). The ALJ pointed out that "some" weakness in the left hand, as Dr. Arora wrote in his own RFC assessment, is much less than the "very severe" limitations Dr. Vigil assigned. (AR 20). ALJ Perkins concluded that Dr. Arora's October 6, 2010 findings imply that most of Mr. Covert's function was preserved, Dr. Arora did not quantify Mr. Covert's limitations as being severe, and Dr. Arora's treatment notes and RFC assessment indicate significantly less impairment than those which Dr. Vigil assessed. (AR 20, 21).

### C.   *Past Relevant Work Analysis and Step Five*

ALJ Perkins next determined Mr. Covert could not perform his "past relevant work" based on the testimony of the vocational expert. (AR 23–24). She proceeded to step five of the sequential analysis. The ALJ adopted the testimony of Ms. Bowman, the vocational expert, that an individual with Mr. Covert's age, education, work experience, and residual functional capacity would be able to perform the jobs of "shipping and receiving weigher" and "cleaner/polisher." (AR 24–25). ALJ Perkins found the testimony to be consistent with the information contained in the Dictionary of Occupational Titles ("DOT"), concluded that Mr. Covert is capable of performing work that exists in significant numbers in the national economy, and therefore is not disabled. (AR 25).

D.     *Points of Error*

In his Motion, Mr. Covert alleges ALJ Perkins committed several reversible errors. Mr. Covert contends that (1) ALJ Perkins's analyses of certain medical opinions of Mr. Covert's treating and examining physicians were not in accordance with controlling law; (2) certain parts of the RFC determination are unsupported by substantial evidence; and (3) the vocational expert's testimony was adopted in error.[2]  (Doc. 15 at 4). The Commissioner responds that ALJ Perkins properly evaluated and discounted the opinions of the various treating and examining physicians when she weighed all of the evidence in the record, that the RFC determination is supported by substantial evidence, and that the vocational expert's testimony was properly adopted to support a finding that Mr. Covert is not disabled. (Doc. 16).

## IV. Analysis

A.     *Medical Source Opinions*

In his first points of error, Mr. Covert argues that ALJ Perkins did not apply the correct legal standards when she considered the medical opinion of his treating physician, Dr. Arora, and his examining physicians, Dr. Vigil and Dr. Morgan. (Doc. 22 at 6). He contends the ALJ did not accord the proper weight to these opinions, and that the ALJ's error requires remand. Defendant does not dispute that Dr. Arora is Mr. Covert's treating physician, or that Dr. Vigil and Dr. Morgan are Mr. Covert's examining, consulting physicians, but maintains the ALJ did not commit legal error because she

---

[2]  Mr. Covert's brief also claims that "[t]he ALJ's consideration of Mr. Covert's pain and credibility was contrary to law," under the sub-heading "Issues for Review." (Doc. 15 at 4). Those issues were not subsequently addressed or briefed in the Motion, and the Court finds that he has failed to state his theory as to those errors with the required specificity. The Court will therefore not review those issues, and treat them as waived. *See Wall v. Astrue*, 561 F.3d 1048, 1066–67 (10th Cir. 2009).

properly discussed and considered all of these medical opinions, and that substantial evidence supports the ALJ's decision.

    1.    *Law Governing Medical Source Opinions*

The Social Security Regulations require the ALJ to evaluate every medical opinion in the record. *See* 20 C.F.R. §§ 404.1527(b) and 416.927(b). "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (per curiam) (citing 20 C.F.R. §§ 404.1527(d)(1), (2) and 416.927(d)(1), (2); Social Security Ruling ("SSR") 96-6p, 1996 SSR LEXIS 3, at *5–6.

The ALJ should accord opinions of treating physicians "controlling weight" when those opinions are well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record; this is known as the "treating physician rule." 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2); *Langley*, 373 F.3d at 1119. A treating physician's opinion is conclusive, and accorded "controlling weight" because the treating physician has a "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." *Doyal*, 331 F.3d at 762 (citing 20 C.F.R. § 416.927(d)(2)). When an ALJ determines that a treating physician's opinion is not well-supported by medically-acceptable clinical and laboratory techniques and inconsistent with other medical evidence, the ALJ must "examine the other physicians' reports to see if they outweigh the treating physician's report . . . ." *Hamlin*, 365 F.3d at 1215 (quotation

16

omitted).

If a treating physician's opinion is not entitled to "controlling weight" it may still receive deference. SSR 96-2p, 1996 SSR LEXIS 9, at *9. It must then be weighed like any other medical opinion that is in the record, in consideration of the following, applicable "deference factors":

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1300–01 (10th Cir. 2003); *see also* 20 C.F.R. §§ 404.1527(c)–(d) and 416.927 (c)–(d). The ALJ must give good reasons—reasons that are "sufficiently specific to [be] clear to any subsequent reviewers"—for the weight that he ultimately assigns to the opinions. *Langley*, 373 F.3d at 1119 (citations omitted).

### 2.    *The ALJ's Analysis of Dr. Arora's November 18, 2010 Statement*

Mr. Covert argues that ALJ Perkins' analysis of Dr. Arora's statement dated November 18, 2010 is "legally flawed." Dr. Arora is Mr. Covert's treating physician, which means that the ALJ had to follow the treating physician rule in analyzing his opinions. Mr. Covert argues that the ALJ considered an impermissible factor in discounting the weight she gave to Dr. Arora's opinion, and erred by not granting Dr. Arora's November 18, 2010 endorsement of Dr. Vigil's opinion "controlling weight." (Doc. 15 at 16–17).

As explained above, Dr. Arora endorsed the findings of Dr. Vigil on November 18, 2010 without explanation. The ALJ afforded Dr. Arora's statement "some weight," but not as to Dr. Arora's endorsement of Dr. Vigil's finding of disability, because the record does

17

not support it, the 2007 date is too remote, and Dr. Vigil's opinion is little more than speculative. (AR 21). The ALJ pointed out that "some" weakness in Mr. Covert's left hand, as Dr. Arora observed in his RFC assessment on October 6, 2010, is much less than the "very severe" limitations Dr. Vigil assigned and Dr. Arora later endorsed. (AR 20). ALJ Perkins concluded that Dr. Arora's October 6, 2010 findings imply that most of Mr. Covert's function was preserved, Dr. Arora did not quantify Mr. Covert's limitations as being severe, and Dr. Arora's treatment notes and RFC assessment indicate significantly less impairment than those which Dr. Vigil assessed. (AR 20, 21).

First, Mr. Covert argues that the ALJ impermissibly considered "quantification" as a factor in discounting Dr. Arora's opinion, but does not provide legal support as to why that factor could not be considered. Pursuant to the treating physician rule, an ALJ must give "controlling weight" to a treating physician's opinion if it is well-supported by medically acceptable techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2); *Langley*, 373 F.3d at 1119. However, an ALJ is never permitted to give "controlling weight" to opinions on issues reserved to the Commissioner, such as a claimant's RFC or a determination of disability—even when the medical source is a treating physician. SSR 96-5P, 1996 SSR LEXIS 2, at *6.

When an ALJ determines that a treating physician's opinion will not receive "controlling weight," the opinion may still receive deference, and must be weighed like any other medical opinion that is in the record, in consideration of the applicable "deference factors." *Watkins*, 350 F.3d at 1300–01; *see also* 20 C.F.R. §§ 404.1527(c)–(d) and 416.927 (c)–(d). The "deference factors" include the catch-all category "factors

18

brought to the ALJ's attention which tend to support or contradict the opinion." *Watkins*,

350 F.3d at 1300–01 (citing 20 C.F.R. §§ 404.1527(c)(6) and 416.927 (c)(6)). Therefore,

a treating physician's "failure to quantify" an impairment as severe will qualify as a

"deference factor" if it tends to support or contradict the treating physician's opinion. In

this case, the ALJ stated that Dr. Arora's failure to quantify Mr. Covert's impairments as

severe influenced her decision to discount Dr. Arora's opinion. If the ALJ's determination

is supported by substantial evidence, then the factor was properly considered.

Mr. Covert claims that the ALJ's reasoning is not supported by substantial

evidence in the record because Dr. Arora quantified Mr. Covert's wrist deterioration.

(Doc. 15 at 17). For support, Mr. Covert argues that Dr. Arora evaluated him many times

over several years, and observed that he had difficulty with his left wrist function "on

more than a dozen occasions." (Doc. 15 at 17) (citing AR 31, 42, 49, 50, 63, 327–28,

551, 626, 633, 652, 677, 699, 706, 714). Upon review of those records the Court finds

the referenced portions of those documents are more accurately described as Mr.

Covert's subjective complaints to Dr. Arora as to the severity of his own wrist and hand

impairments. None of those records contain independent findings by Dr. Arora

quantifying Mr. Covert's limitations from his hand or wrist condition.

Mr. Covert next argues that Dr. Arora quantified the severity of his impairment

when Dr. Arora observed that Mr. Covert had decreased range of motion in his wrist and

some weakness in his left hand. (Doc. 15 at 17) (citing AR 69). He points out that Dr.

Arora assigned him limitations in his pushing and pulling abilities in the October 6, 2010

RFC assessment, and claims that is also evidence of quantification. (Doc. 15 at 17)

(citing AR 69).

In the RFC assessment, Dr. Arora found that Mr. Covert is "limited" in his upper extremities with regards to pushing and pulling. (AR 69). The form asked for him to describe the nature and degree of the limitation, which Dr. Arora declined to do. Asked the question "[w]hat are the medical finding[s] supporting this opinion?" Dr. Arora responded: "weakness in the left hand. Decreased range of motion at left wrist (see attached notes)." (AR 69). The attached notes state that Mr. Covert has "some weakness" in his grip strength, flexion, extension, abduction, and adduction of the thumb and abduction and adduction of the fingers, and decreased range of motion in his wrist. (AR 64). The ALJ weighed this evidence and found it suggests Mr. Covert's function was actually preserved, and that "some weakness" does not mean that Mr. Covert has severe limitations to the point of disability. The Court finds that the ALJ's conclusion is reasonable and supported by substantial evidence.

Mr. Covert maintains that Dr. Arora's limitation of Mr. Covert in his ability to handle and finger with his left hand is further evidence of "quantification." (Doc. 15 at 17) (citing AR 69). However, Mr. Covert's argument is not persuasive because Dr. Arora only assessed that Mr. Covert could not do *repetitive* handling and fingering with his left hand, and not that he could never do any handling or fingering as Mr. Covert asserts. (AR 69). The RFC assessment does not make clear the extent of the manipulative limitations Dr. Arora assessed, therefore supporting the ALJ's observation that Dr. Arora failed to quantify Mr. Covert's manipulative limitations. (AR 21).

ALJ Perkins considered all of Dr. Arora's opinions prior to November 18, 2010, and found they imply most of Mr. Covert's hand function is preserved and his limitations are "much less than 'very severe'" as Dr. Vigil assessed. (AR 20). The ALJ also noted

that Dr. Arora found that Mr. Covert had extension and flexion of the left wrist, while Dr. Vigil did not. (AR 20, 21) (citing AR 21, 69, 70, 407, 517, 525). The ALJ concluded that Dr. Arora's medical observations and opinions prior to November 18, 2010 could not provide support for the conclusion that Mr. Covert has total inability to use his left hand, as Dr. Vigil had found and Dr. Arora subsequently adopted on November 18, 2010. (AR 21). Further, Dr. Arora adopted all of Dr. Vigil's more restrictive findings and conclusions with no explanation. Thus, the ALJ pointed to sufficiently specific examples of internal inconsistency between Dr. Arora's medical records—and in particular Dr. Arora's failure to quantify Mr. Covert's total inability to use his left hand in prior medical records—to discount the November 18, 2010 statement. The Court also finds that substantial evidence supports the ALJ's finding that Dr. Arora failed to quantify the severity of Mr. Covert's limitations.

The ALJ also compared Dr. Arora's opinions with other medical evidence in the record. The ALJ noted that various medical sources found Mr. Covert's left wrist had healed and ordered Mr. Covert to physical therapy to regain full function and use. The ALJ pointed out that on at least one occasion Dr. Arora was not aware that Mr. Covert had ceased his physical therapy, even though the evidence shows Mr. Covert could regain most of the function in his left upper extremity within twelve months of return to therapy. (AR 20). This provides further support that Dr. Arora's November 18, 2010 statement is inconsistent with, and not supported by, other medical evidence in the record.

The Court holds that the ALJ appropriately applied the treating physician rule and considered the applicable "deference factors" in deciding not to afford Dr. Arora's

November 18, 2010 statement "controlling weight." There is substantial evidence that Dr.
Arora's opinion is internally inconsistent and inconsistent with, and not supported by,
other medical evidence in the record, and therefore his opinion could be properly
discounted by the ALJ. *See Pisciotta v. Astrue*, 500 F.3d 1074, 1077–78 (10th Cir.
2007).

      *3.*    *Dr. Vigil's Opinion*

      Mr. Covert also argues that the ALJ committed error because she incorrectly
considered and discounted Dr. Vigil's medical opinion. (Doc. 15 at 18). It is undisputed
that Dr. Vigil is a non-treating, examining medical source, having examined Mr. Covert
only one time on November 10, 2010. (AR 511–16).

      The ALJ accorded great weight to Dr. Vigil's clinical observations but limited
weight to his conclusions, especially to his finding that Mr. Covert has been disabled
since 2007. (AR 22). The ALJ explained that she believed the limitations Dr. Vigil
assessed to be inconsistent with the record as a whole and his own objective medical
findings, and found his conclusion that Mr. Covert is disabled to be little more than
speculative. (AR 22). She also determined Dr. Vigil's RFC assessment is a reflection of
Mr. Covert's subjective reports, and not Dr. Vigil's own objective findings. (AR 22).

      Mr. Covert maintains that Dr. Vigil's findings are in fact consistent with other
evidence in the record and are not based solely on Mr. Covert's subjective complaints,
and that the ALJ should have considered other factors in making her findings.

      Dr. Vigil assessed Mr. Covert a more restrictive RFC than any previous treating,
examining, or consulting physician. He also found that Mr. Covert has been disabled
since 2007. While the ALJ may consider determinations that a claimant is disabled, or a

finding of a claimant's RFC, the final determination is left to the ALJ. 20 C.F.R. §§ 404.1527(d) and 416.927(d). However, the opinions of any medical source, even on issues reserved for the ALJ like a claimant's RFC or disability, must never be ignored. SSR 96-5p, 1996 SSR LEXIS 2, at *5–6. "If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." *Id.* Like any medical opinion, an ALJ will determine what weight to give it by applying the "deference factors."[3]  *See Hamlin*, 365 F.3d at 1215. "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Robinson*, 366 F.3d at 1084 (citing 20 C.F.R. §§ 404.1527(d)(1), (2) and 416.927(d)(1), (2); SSR 96-6p, 1996 SSR LEXIS 3, at *5–6.

        In this instance, the ALJ discounted Dr. Vigil's opinion in consideration of several of the deference factors, specifically the nature and extent of the treatment relationship; the degree to which it is supported by relevant evidence; and consistency between the opinion and record as a whole. The ALJ noted that Dr. Vigil only examined Mr. Covert one time, for the purposes of supporting his disability claim, that he was not a treating medical source, and concluded Dr. Vigil's determination of disability going as far back to 2007 was speculative. The ALJ's conclusions were reasonable in light of the fact that no

---

[3]  Again, those factors are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

other physician prior to Dr. Vigil had assigned as restrictive functional limitations or found Mr. Covert to be disabled as far back to 2007.

The ALJ therefore found Dr. Vigil's restrictive RFC assessment to be inconsistent with the record as a whole. The ALJ noted that Dr. Wiemann reported on September 24, 2007 that Mr. Covert was "doing well" and had intact motor function with some limitation in wrist flexion and extension due to stiffness. (Doc. 16 at 7) (citing AR 19, 356). The ALJ also referred to Dr. Gilmore's notation from May 2, 2008 that Mr. Covert has normal neurological findings and good wrist flexion and tension, although somewhat limited due to stiffness. (Doc. 16 at 17) (citing AR 343). Further, the ALJ pointed out that Mr. Covert's occupational therapist assessed on July 21, 2008 that he had good range of motion in his left wrist, his grip strength was forty-eight pounds, and he had no muscle atrophy. (Doc. 16 at 17) (citing AR 290). All of these findings conflict with Dr. Vigil's findings of marked limitations from Mr. Covert's left wrist impairment.

Mr. Covert claims that Dr. Vigil's findings are in fact consistent with other evidence in the record, specifically with Dr. Arora's RFC assessment on October 6, 2010 and his November 18, 2010 statement concurring with Dr. Vigil's findings. (Doc. 15 at 18) (citing AR 521). However, Mr. Covert does not explain how Dr. Arora's opinions are specifically consistent with Dr. Vigil's, besides repeating that Dr. Arora concurred with all of Dr. Vigil's findings. The Court already explained that substantial evidence supports the ALJ's decision to discount Dr. Arora's adoption of Dr. Vigil's opinions. Dr. Arora's October 4, 2010 RFC assessment and Dr. Vigil's RFC assessment actually differ in several respects, because Dr. Vigil's assigned limitations that are more restrictive than Dr. Arora's. For example, Dr. Vigil limited Mr. Covert to lifting and pulling less than ten

pounds frequently or occasionally, (AR 517), but Dr. Arora considered lifting and pulling to be "not a problem" for Mr. Covert and assigned no limitations, (AR 69). Therefore, Mr. Covert's argument that the ALJ erred by discounting Dr. Vigil's opinion because it is consistent with Dr. Arora's opinions is not persuasive.

Mr. Covert also argues that Dr. Vigil's opinion is consistent with other medical source opinions, citing generally to five pages in the "Discussion" section of his Motion and then specifically to three separate examples. (Doc. 15 at 19) (citing Doc. 15 at 4–8; AR 337, 340, 343). Mr. Covert claims that on March 2, 2008, Dr. Gilmore found forearm atrophy; on June 18, 2008, John M. Veitch, M.D. found "significantly" reduced range of motion in his left wrist; and an occupational evaluation on June 27, 2008 found that Mr. Covert presented with significantly reduced range of motion and pain in his left hand, wrist, and forearm affecting his functioning. (Doc. 15 at 19).

However, Mr. Covert neglects to explain how any of these medical opinions support, or are consistent with, Dr. Vigil's findings. The Court will not search through the five pages of the "Discussion" section of Mr. Covert's Motion, or hundreds of pages of medical records, to piece together evidentiary support for him. As for the records he identifies with specificity, Mr. Covert presents those medical opinions out of context. Dr. Gilmore noted that Mr. Covert had "some atrophy of the forearm secondary to disuse but with adequate muscle bulk and function," (AR 343); Dr. Veitch only reported that Mr. Covert "significantly" guarded his wrist, needed to attend physical therapy to regain wrist motion, and ordered him to stop wearing his wrist splint all of the time, (AR 340); and the occupational therapist noted significantly decreased range of motion and strength, but opined that if Mr. Covert did his physical therapy exercises he would be able to achieve

25

functional range of motion, strength, and coordination again. (AR 337). Mr. Covert fails to explain how any these opinions support, or are consistent with, Dr. Vigil's findings, or undermine the ALJ's weighting of Dr. Vigil's medical opinion.

Mr. Covert also argues that the ALJ erred in finding that Dr. Vigil's RFC assessment was based primarily on the claimant's subjective complaints. Mr. Covert states that conclusion is "not true and contrary to law." (Doc. 15 at 19). Mr. Covert points out that Dr. Vigil reviewed Mr. Covert's medical records for up to thirty minutes before assessing Mr. Covert's functional limitations, and therefore his findings have a "much broader base" than his physical examination of Mr. Covert alone. (Doc. 15 at 19–20) (citing AR 511).

Mr. Covert contends that the ALJ's consideration of this finding was "contrary to law." However, an ALJ may consider any factor brought to her attention which tends to support or contradict the opinion. *See* 20 C.F.R. §§ 404.1527(c)(6) and 416.927(c)(6). In this case ALJ Perkins found that, after reviewing the record, Dr. Vigil's RFC assessment reflected Mr. Covert's subjective complaints about his ailments, and not objective medical evidence. The Court finds that the ALJ properly factored in his finding in discounting Dr. Vigil's opinion.

The Court will next determine whether Dr. Vigil's finding that Dr. Vigil's RFC assessment was based on Mr. Covert's subjective complaints was supported by substantial evidence. The ALJ recognized that Dr. Vigil had reviewed Mr. Covert's medical records and completed a physical examination of him before making his RFC assessment and forming his medical opinions. The medical records before Dr. Vigil noted improvement in Mr. Covert's left wrist and clavicle conditions, as well as Mr.

Covert's resistance to various treatments that his doctors opined would be effective. The Court may only consider whether the ALJ followed the specific rules of law in weighing Dr. Vigil's opinion, but may not reweigh the evidence or substitute its own judgment for the Commissioner's. *Cowan v. Astrue*, 552 F.3d 1182, 1185 (10th Cir. 2008). Mr. Covert asks this Court to reweigh the evidence, in his favor, which the Court cannot do. The Court finds that given the entirety of the ALJ's discussion and findings, substantial evidence supports the ALJ's conclusion as to the veracity of Dr. Vigil's RFC assessment.

Mr. Covert also argues that the ALJ erred by not considering the factors set forth in SSR 96-8p—the factors the ALJ uses to make her RFC findings—when she considered Dr. Vigil's opinion. (Doc. 15 at 20) (citing SSR 96-8p, 1996 SSR LEXIS 5, at *14–15). A medical source statement may not be equated with the ALJ's determination of a claimant's RFC, and are analyzed under different standards. *See* SSR 96-5p, 1996 SSR LEXIS 2, at *7; *see also* 20 CFR 404.1527 and 416.927. Mr. Covert's assertion that the ALJ erred because she did not analyze Dr. Vigil's opinion, a medical source statement, under the "RFC standards" set out in SSR 96-5p is simply wrong.

Mr. Covert has failed to establish how the ALJ's analysis and discussion of Dr. Vigil's medical opinion was inadequate or not supported by substantial evidence. The Court finds that ALJ applied several applicable "deference factors" in considering Dr. Vigil's opinion, and that determination is supported by substantial evidence in the record, as discussed above.

### 4.    *Dr. Morgan's Opinion*

Mr. Covert contends the ALJ committed error because she incorrectly considered and discounted Dr. Morgan's medical opinions. (Doc. 15 at 20–22). It is undisputed that

Dr. Morgan is a non-treating, examining medical source, having examined Mr. Covert only one time on February 4, 2011. (AR 511–16). The ALJ accorded little weight to Dr. Morgan's conclusion on February 4, 2011 that Mr. Covert's mental impairments have been disabling since at least 2007, and that his impairments, in combination, make it highly unlikely that he will ever return to work. (AR 14). The ALJ also gave little weight to Dr. Morgan's later-completed RFC assessment dated April 27, 2011. (AR 15).

The ALJ explained her reasons for discounting Dr. Morgan's opinions. First, she noted that Dr. Morgan's opinions are on issues reserved to the Commissioner, because they relate to a finding of disability and the RFC determination. (AR 14). Second, she pointed out that Mr. Covert had no difficulty with the Mini Mental State Examination, and that the neuropsychological screening indicated that he has only "mild cognitive impairment." (AR 14–15). The ALJ noted that even though Mr. Covert complains of depression, he has no suicidal urges or plans to harm himself. (AR 15). The ALJ concluded that Dr. Morgan's conclusions are not consistent with other evidence in the record. (AR 15–16). Finally, the ALJ noted that Dr. Morgan only saw Mr. Covert once, for the purpose of evaluating his condition for his disability claim, and that he is not a treating source. (AR 15).

Mr. Covert contends that none of those reasons are grounds for diminishing the impact of Dr. Morgan's findings. Specifically, he alleges that the fact Dr. Morgan only evaluated Mr. Covert once is not a legitimate reason to discount the opinion, and that Dr. Morgan's conclusions are consistent with the record as a whole.

First, Mr. Covert argues that the ALJ could not discount Dr. Morgan's opinion just because Dr. Morgan only evaluated Mr. Covert one time. (Doc. 15 at 21). The ALJ was

28

entitled to consider the nature and extent of the treatment relationship under the Regulations. Mr. Covert points the Court to *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012), in support of his argument that the ALJ's reliance on that factor was impermissible. In *Chapo* the ALJ discounted the examining medical-source's unopposed opinion only because of the short-lived treating relationship that had lasted approximately two months. However, in this case the ALJ's consideration of the context of Dr. Morgan's treatment relationship with Mr. Covert was reasonable. Dr. Morgan only saw Mr. Covert one time, for the purpose of evaluating him for his disability claim. The ALJ weighed this factor in concert with others in discounting Dr. Vigil's opinion. The Court finds that the ALJ's reliance on this factor was therefore permissible.

Mr. Covert also contends that Dr. Morgan's findings are in fact consistent with his own objective findings, and the ALJ erred by concluding otherwise. Specifically, Mr. Covert argues that the ALJ impermissibly considered Dr. Morgan's objective findings that Mr. Covert has only mild cognitive impairment and has no suicidal urges. (Doc. 15 at 21). Mr. Covert maintains that since he is not claiming an intellectual impairment or disability from suicidal ideation that the absence of those two factors are not relevant to the ALJ's analysis of the severity and limiting effects of his mental impairments. (Doc. 15 at 21–22). He also argues that his cognitive impairments are secondary to his claim that he has difficulty concentrating and interacting with coworkers and supervisors, and that there is no requirement that he be suicidal or completely inactive in order to claim disability. (Doc. 17 at 2).

Mr. Covert is incorrect that his lack of some depressive symptoms is irrelevant to the ALJ's analysis of the severity of his mental impairments. Mr. Covert's suicidal urges

or plans to self-harm, or lack thereof, go to the severity of his complaints of disabling depression. They may also provide some indication of past periods of decompensation or indicate likelihood of future decompensation, which is relevant at step two of the ALJ's sequential analysis.

The ALJ found that Dr. Morgan's restrictive RFC assessment and finding of disability are unsupported by relevant evidence and inconsistent with the record. (AR 15–16). The ALJ pointed out that Mr. Covert told Dr. Morgan that he does not socialize, participate in community activities, and is withdrawn and isolated. Dr. Morgan opined that Mr. Covert has marked limitations in getting along with co-workers and peers. However, Mr. Covert stated in his Function Report that he spends time with family, has a friend that he speaks to regularly, is a reverend and does charity work with a church, and has no problems getting along with other people. (AR 15–16) (citing 205-07). Mr. Covert also testified that he works with the Albuquerque Rescue Mission over the phone. (AR 86). Whether Mr. Covert is able to socialize with others is relevant, as it goes towards whether he has limitations working with others and is able to do "object-focused" work, as the ALJ assessed. Other, similar conflicts exist between Dr. Morgan's opinions and the record. For example, Dr. Morgan reported that Mr. Covert had been sober for four years, but Mr. Covert told other doctors at least a year prior that he regularly drinks.

The ALJ also found Dr. Morgan's opinion to be internally inconsistent, because some of his conclusions did not match his objective findings. As an example, ALJ Perkins pointed out that Mr. Covert had no difficulty on the Mini Mental State Examinations and his difficulties on neuropsychological testing reflected only a mild cognitive impairment, but that Dr. Morgan assessed him with marked limitations in other

areas of mental functioning, such as ability to maintain attention and concentration for extended periods of time. (AR 15). The ALJ is allowed to discount a medical opinion because she finds it is internally inconsistent or inconsistent with the record as a whole. *See Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir. 2007).

Further, Mr. Covert's ability to maintain attention and concentration are important in the ALJ's mental RFC assessment of additional limitations, and therefore relevant to the ALJ's analysis of Mr. Covert's disability claim. The ALJ considered the results of the tests that Dr. Morgan administered to Mr. Covert as indicative of those specific limitations. Mr. Covert has failed to provide any reasons why the ALJ's reliance on those results was improper. Therefore, the Court finds that ALJ Perkins properly considered this evidence in making a finding that Dr. Morgan's medical opinions are internally inconsistent.

As stated above, the ALJ may consider Dr. Morgan's finding of disability and RFC assessment, but the final determination is left to the ALJ. 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ is required to weigh the opinion using the "deference factors." *See Hamlin*, 365 F.3d at 1215. In this case, the ALJ discounted Dr. Morgan's opinion in consideration of several of the deference factors, specifically the nature and extent of the treatment relationship, degree to which the medical opinion is supported by relevant evidence, and consistency between the opinion and record as a whole. The Court may only consider whether the ALJ followed the specific rules of law in weighing Dr. Morgan's opinion, but may not reweigh the evidence or substitute its own judgment for the Commissioner's. *Cowan*, 552 F.3d at 1185. Therefore the Court finds that ALJ Perkins properly applied several "deference factors" when she weighed Dr. Morgan's opinions,

and that her determination to accord his opinions "little weight" to be supported by substantial evidence in the record.

### B.    RFC Determination

Mr. Covert alleges that the ALJ erred in making her RFC determination because she did not incorporate all of the opinions and findings of Dr. Arora, Dr. Vigil, and Dr. Morgan into the RFC determination.[4]  (Doc. 15 at 22). An RFC determination is an administrative assessment of the extent to which a claimant's medically determinable impairments and related symptoms affect her ability to perform work-related activities. 20 C.F.R. §§ 404.1545, 416.945; SSR 96-8p, 1996 SSR LEXIS 5, at *5.

Mr. Covert asserts that the ALJ erred in making her RFC findings with regards to Mr. Covert's ability to lift, push, and pull, because they contradict treating and examining opinion evidence. (Doc. 15 at 19, 22) (citing AR 17; Doc. 15 at 16–20). In one portion of his Motion, Mr. Covert states that the ALJ found he can lift twenty pounds frequently and push and pull in that amount occasionally; in another part he states that the ALJ found that Mr. Covert is able to "perform sustained work that involves lifting, pushing, and pulling twenty pounds occasionally, and ten pounds frequently on the right, occasionally on the left." (Doc. 15 at 19, 22). He then narrows his argument, contending that only Dr. Vigil's RFC assessment contradicts with the ALJ's RFC determination. (Doc. 15 at 19).

Contrary to Mr. Covert's versions of the ALJ's findings, the ALJ actually concluded that Mr. Covert can lift no more than ten pounds frequently and no more than twenty pounds occasionally, and that he can push or pull in his right upper extremity and lower

---

4  Mr. Covert cites to "C.F.R. § 404.1569a(c)(vi); Saiz v. Barnhart, 392 F.3d 397, 399 n.2 (10th Cir. 2004)" for legal support for his argument. The former is an incomplete citation, and the latter is a citation to a footnote stating that the Tenth Circuit had not conducted oral argument in that case.

extremities in a similar manner; but in his left upper extremity he can only occasionally push or pull regardless of weight. (AR 17). Dr. Vigil limited Mr. Covert to lifting less than ten pounds frequently or occasionally, and assessed Mr. Covert to have unspecified "limited" pushing and pulling abilities in both his upper and lower extremities. (AR 517).

However, the Court cannot undergo rigorous analysis as to this point of error, because Mr. Covert has not provided adequate briefing on this issue. Mr. Covert makes brief, conclusory arguments, stating "there is not substantial evidence of record for [the ALJ's RFC finding]; the ALJ's decision should be reversed"; and that the ALJ's finding is "contrary to treating and examining opinion evidence of record." (Doc. 15 at 19, 22). Mr. Covert provides no reasoning for his conclusion, points to no evidence in the record for support, and does not explain how the ALJ's RFC determination and Dr. Vigil's RFC assessment differ, leaving the Court to infer his argument for him. The Court finds that Mr. Covert has failed to adequately present his claim with regards to this point of error, and it is therefore waived. *See Wall*, 561 F.3d at 1066–67.

Mr. Covert also maintains that the ALJ committed error by failing to explain why she adopted some, but not all, of Dr. Morgan's findings. (Doc. 15 at 23). The ALJ did not find that Mr. Covert has any severe mental impairments at step two, but did assign to him some nonexertional limits resulting from his mental impairments at step four. Specifically, the ALJ found that "[Mr. Covert] can understand, remember, and carry out simple instructions and tasks in work that is object-focused (i.e., incidental contact with others is not precluded)." (AR 17). In making that finding she incorporated her entire discussion of Mr. Covert's mental impairments from her analysis at step two of the sequential evaluation. The ALJ also emphasized that Dr. Morgan opined that Mr. Covert is only

slightly impaired in his abilities to understand, remember, and carry out very short and simple job instructions and to remember locations and work-like procedures. She also stated that Mr. Covert had no difficulty on the Mini Mental State Examination and his performance on neuropsychological testing was consistent with only mild cognitive impairment. (AR 23) (citing AR 726, 728).

Mr. Covert complains that while the ALJ adopted a portion of Dr. Morgan's opinion, she ignored his finding that Mr. Covert has a marked impairment in maintaining attention and concentration for more than two hours at a time, and did not explain her reasons why. (AR 16, 728). Mr. Covert asks the Court to hold it was reversible error for the ALJ to reject and accept parts of Dr. Morgan's RFC assessment piecemeal without explanation, citing *Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007), and *Frantz v. Astrue*, 509 F.3d 1299 (10th Cir. 2007), for support. (Doc. 15 at 12). Those cases follow the holding of *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996), that an ALJ must discuss any uncontroverted evidence she chooses not to rely upon and significantly probative evidence that she rejects, in addition to the evidence supporting her decision. *See Haga*, 482 F.3d at 1207; *Frantz*, 509 F.3d at 1302. Although he does not directly say so, Mr. Covert's suggestion that "Dr. Morgan's limitation to less than two hours of concentration takes the case out of the realm of simple work," implies that Mr. Covert believes this evidence to be significantly probative. (Doc. 15 at 23).

At step two, ALJ Perkins addressed the fact that both Dr. Morgan and Dr. Vigil found that Mr. Covert has marked limitations in maintaining attention and concentration, and that Dr. Arora endorsed the findings of Dr. Morgan in a "brief, conclusory, and unsupported" statement. (AR 14,15). In fact, on October 6, 2010, Dr. Arora had found

that Mr. Covert's ability to maintain attention and concentration for extended periods was "no concern," and he had no significant limitation in this area. (AR 70). The ALJ considered and discounted all of their medical opinions for various reasons, and incorporated those arguments into her RFC analysis at step four by reference. The ALJ also mentioned the conflict between Mr. Covert's normal outcomes from the mental diagnostic examinations and the restrictive mental functioning limits assigned by the consulting physicians. It is the purview of the ALJ "to resolve any conflicts in the record." *Haga*, 482 F.3d at 1208. The ALJ resolved such conflicts in favor of the diagnostic exam results, and made a mental RFC determination consistent with those results. (AR 23).

The Commissioner also contends that evidence supports the ALJ's determination that Mr. Covert is only slightly impaired in his ability to understand, remember, and carry out very short and simple job instructions and remember locations and work-like procedures. (Doc. 16 at 9) (citing AR 23, 728). The ALJ noted that Mr. Covert reported no problem getting along with family, friends, neighbors, or others, and that he is a minister and does charity work. (AR 16). This evidence supports the ALJ's finding that Mr. Covert is not precluded from having incidental contact with other people while working, or doing work that is "object-focused." The Court finds that the diagnostic exam results, coupled with the other evidence that was considered, supports the ALJ's mental RFC determination. (Doc. 16 at 9).

The Court finds that the ALJ properly considered all of the evidence, including the medical source opinions, in making her RFC determination and adequately explained evidence relied upon and rejected as required by *Haga*. The RFC determination is further supported by substantial evidence in the record.

C.      *Vocational Expert Testimony*

Mr. Covert alleges that the ALJ erred in adopting the testimony of the vocational expert, because (1) the ALJ misconstrued the vocational expert's testimony; (2) if the ALJ had included a handling limitation then Mr. Covert could only perform a job that exists in insignificant numbers in the national and regional economy; and (3) the shipping and receiving job is beyond his abilities. (Doc. 15 at 23–26). The Commissioner responds that the ALJ committed none of these errors, and that the ALJ properly questioned and adopted the vocational expert's testimony. (Doc. 16 at 9–12).

1.      *The ALJ Did Not Misconstrue the Vocational Expert's Testimony*

Mr. Covert claims that the ALJ misconstrued the vocational expert's testimony, improperly adopted it at step five, and therefore failed to satisfy her burden of showing that Mr. Covert retains a sufficient RFC to perform other jobs existing in significant numbers in the national or regional economy. (Doc. 15 at 26). The Commissioner responds that the ALJ's first hypothetical question to the vocational expert matched all of the RFC limitations she assigned to Mr. Covert, and therefore the ALJ properly relied on the vocational expert's testimony regarding the number of available jobs in the national economy. (Doc. 16 at 10 n.5).

During the hearing, the ALJ's first hypothetical question to the ALJ was whether jobs exist in the national and regional economy for an individual with Mr. Covert's same age, education, work experience, and RFC for a limited range of light work. (AR 96). The vocational expert testified that an individual that is the same age, with the same education, work experience, and RFC as Mr. Covert, would be able to perform the requirements of shipping and receiving weigher, with 200,000 jobs in the national

36

economy and 500 jobs in the region, and cleaner/polisher, with 250,000 jobs in the

national economy and 1,000 jobs in the region. (AR 96). She further reduced those

numbers by half, explaining that the numbers available for both jobs are further restricted

in consideration of the limitation to occasional reaching with the left, upper extremity. (AR

96). The vocational expert determined that in consideration of reaching limitation, there

are 100,000 jobs nationally and 250 jobs regionally available for shipping and receiving

weigher, and 125,000 jobs nationally and 500 jobs regionally available for

cleaner/polisher. (AR 96).

Mr. Covert claims the ALJ misrepresented the vocational expert's testimony.

According to Mr. Covert, the way the ALJ recited the testimony implies the ALJ actually

found that Mr. Covert has no limitation of "occasionally reaching," which conflicts with her

RFC determination, and requires remand for clarification.

However, the ALJ restated the conclusions of the vocational expert as to

occupations and jobs numbers the same way that the vocational expert described them.

She recited the full number of jobs for shipping and receiving weigher and

cleaner/polisher, and then reduced them by half because of the "occasional reaching"

limitation. The ALJ concluded that the numbers of jobs "the hypothetical individual can

actually perform" are: 100,000 nationally and 250 regionally for shipping and receiving

weigher, and 125,000 nationally and 500 regionally for cleaner/polisher. (AR 25). The

ALJ's findings at step four provide further affirmation the vocational expert's testimony

was appropriately explained. At step four, the ALJ recited her entire RFC finding,

including the "occasional reaching" limitation, and stated that it is "consistent with my first

hypothetical question to the vocational expert . . . ." (AR 17). The Court does not find any

bases for Mr. Covert's contention that the ALJ "misconstrued" the testimony; rather, the ALJ was thorough in her analysis of the vocational expert's testimony.

> 2. *Insignificant Number of Shipping and Receiving Weigher Jobs*

Mr. Covert correctly states that the ALJ did not assign a handling limitation to Mr. Covert, and that she did not rely upon the vocational expert's answer to another hypothetical question regarding a handling limitation. (Doc. 15 at 25). Mr. Covert contends that if the ALJ had assigned a handling limitation, and then adopted the vocational expert's hypothetical answer regarding the handling limitation, then the only occupation Mr. Covert could do is the shipping and receiving weigher job. Mr. Covert claims that the number of shipping and receiving weigher jobs existing nationally and regionally is not significant, in which case a finding of disability would be required under the Regulations. (Doc. 15 at 25).

However, the ALJ did not assign a handling limitation to Mr. Covert, and Mr. Covert has not even alleged that the ALJ erred by failing to assign him such a handling limitation. Therefore, the Court will not find that the ALJ erred in failing to adopt the vocational expert's testimony as to handling limitations, and the Court need not conduct an inquiry into whether the number of shipping and receiving weigher jobs alone is significant.

> 3. *Conflict between VE's Testimony and DOT was Harmless Error*

Mr. Covert also complains that the ALJ failed to resolve a conflict between the vocational expert's testimony and the Dictionary of Occupational Titles. Mr. Covert explains that the ALJ limited Mr. Covert to work involving "simple instructions and work." Mr. Covert contends that "simple work" is consistent with reasoning development level of

2, but that the DOT assesses the job of shipping and receiving weigher as requiring a reasoning development level of 3. (Doc. 15 at 24) (citing DICTIONARY OF OCCUPATIONAL TITLES, § 222.387-074 (rev. 4th ed. Supp. 1986) *available at* http://www.occupationalinfo.org/22/222387074.html).

Mr. Covert is correct that a facial conflict exists in the record between Mr. Covert's limitation to simple instructions and simple tasks and the level-three reasoning required for the shipping and receiving weigher job. *See Garcia v. Barnhart*, No. 05-2322, 188 Fed. Appx. 760, 767 (10th Cir. July 13, 2006) (unpublished). The Commissioner responds with various post-hoc justifications to support the ALJ's decision. The Commissioner contends that Plaintiff's above-average score on an abstract reasoning exam and Dr. Morgan's assessment that Mr. Covert has a high average/superior intelligence quotient show that Mr. Covert can do jobs that require level-three reasoning. (Doc. 16 at 10) (citing AR 726). This line of reasoning is foreclosed by the fact that the ALJ herself limited Mr. Covert to work that requires simple instructions and simple work. *See Garcia*, 188 Fed. Appx. at 767. Ordinarily, the Court may reverse and remand for an explanation, if any, that would resolve the conflict so as to permit reliance on the vocational expert's testimony. *See id.* However, the Court finds that the error was harmless because the ALJ also assessed that Mr. Covert could do the job of cleaner/polisher, and the vocational expert testified that 175,000 of those jobs exist nationally.

Mr. Covert does not argue that the ALJ failed to establish that the job of polisher exists in significant numbers in either the regional or national economy, despite spending one page in his brief detailing why the position of shipping and receiving weigher does

39

not exist in significant numbers. Therefore, the Court finds this argument was deliberately waived.

If Mr. Covert had alleged the number of cleaning/polisher jobs to be insignificant, the guidance of the Tenth Circuit would lead the Court to conclude otherwise. *See Botello v. Astrue*, , No. 09-1238, 376 Fed. Appx. 847, 851 (10th Cir. Apr. 26, 2010) (unpublished) (holding that 67,250 jobs available nationally is significant); *Strokes v. Astrue*, No. 07-5046, 274 Fed. Appx. 675, 684 (10th Cir. Apr. 18, 2008) (unpublished) (holding 152,000 jobs available nationally is significant). Mr. Covert conceded this point in his Motion, acknowledging that the Tenth Circuit has held that jobs existing in numbers far less than 175,000 to be "significant." (Doc. 15 at 25) (citing *Strokes*, 274 Fed. Appx. At 684).

The Court concludes that the ALJ erred by not addressing the inconsistency between the vocational expert's testimony and the DOT with regards to the reasoning level required by the shipping and receiving weigher job. However, the error was harmless because Mr. Covert can still do the job of cleaner/polisher, and that job exists in significant numbers in the national economy. The Court holds that "no reasonable administrative factfinder, following the correct analysis [at step five], could have resolved the factual matter in any other way" and that the ALJ properly found Mr. Covert to be not disabled at step five. *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004).

## V. Conclusion

For the reasons discussed above, the Court concludes that the ALJ either committed none of the errors that Mr. Covert alleges, or that any such error was harmless. In addition, the Court finds that substantial evidence supports all of the ALJ's

determinations challenged by Mr. Covert.

**IT IS THEREFORE ORDERED** that *Plaintiff's Motion to Reverse and Remand for Rehearing with Supporting Memorandum* (Doc. 15) be **DENIED** and that this cause of action is **DISMISSED WITH PREJUDICE**.

_____
THE HONORABLE CARMEN E. GARZA
UNITED STATES MAGISTRATE JUDGE